NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0171n.06

No. 08-6522

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Mar 18, 2010**

LEONARD GREEN, Clerk

MIMI LOAN; ASHLEY LOAN; AMANDA LOAN,

     Plaintiffs-Appellants,

v.

PRUDENTIAL INSURANCE COMPANY OF AMERICA,

     Defendant-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY

                        /

BEFORE:    GUY, CLAY, and WHITE, Circuit Judges.

     **CLAY, Circuit Judge.**  Plaintiffs, Mimi Loan, Ashley Loan, and Amanda Loan appeal pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132, from the district court's order affirming the administrative denial by Defendant Prudential Insurance Company of America ("Prudential") of accidental death benefits to Plaintiffs. For the reasons set forth below, we hereby **VACATE** the district court's order and **REMAND** for further proceedings consistent with this opinion.

1

**BACKGROUND**

At approximately 7:30 p.m. on June 29, 2006, Ernest Hollis Loan, a 53-year-old, 205 pound man, fell down two flights of stairs while attempting to descend his basement steps. According to Mr. Loan's wife, Mimi Loan, Mr. Loan had consumed three glasses of wine between 5:30 p.m. and 7:00 p.m. Mrs. Loan indicated that Mr. Loan had just completed a business transaction over the phone and was helping her with a home repair at the time of his fall. She further stated that he was not impaired in his motor skills, speech, or balance. At the time, Mr. Loan was taking an over-the-counter cold medication and Clonazepam, prescribed by a doctor to treat depression.

Following the fall, Mr. Loan was transported by ambulance to the University of Kentucky Chandler Medical Center. At approximately 8:48 p.m., Mr. Loan's blood was drawn. A toxicology report generated from this blood sample indicates Mr. Loan's plasma alcohol level was 178 mg/dL.

Mr. Loan remained in critical condition in the neurosurgery intensive care unit for approximately one week. On July 6, 2006, Mr. Loan was removed from life support and passed away. According to his death certificate, Mr. Loan died of blunt force head trauma due to a fall down the stairs.

Plaintiffs, Mr. Loan's widow and his two children, are named beneficiaries under his group accidental death insurance policy. The policy was issued by Prudential through Mr. Loan's employer, Bayer Corporation, and pays $300,000. Under the policy, Prudential acts as the Claims Administrator with "sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits." The policy further provides:

Benefits for accidental Loss are payable only if all these conditions are met:

(1) The person sustains an accidental bodily injury while a Covered Person.

2

(2) The Loss results directly from that Injury and from no other cause.
. . .
A Loss is not covered if it results from any of these:
. . .
(9) Being legally intoxicated or under the influence of any narcotic unless administered or consumed on the advice of a Doctor . . .

(App. at 137-39).

Following Mr. Loan's death, Plaintiffs submitted a claim for the full policy amount. On November 7, 2006, Prudential sent a letter to Plaintiffs denying their claim, citing Mr. Loan's alleged intoxication at the time of his fall. On November 27, 2006, Plaintiffs appealed the decision. On April 26, 2007, Prudential denied the appeal and upheld the decision to disallow the claim for accidental death benefits.

In the initial and secondary review of Plaintiffs' claim, Prudential used in-house doctors who were not experts in toxicology to review the toxicology report performed on the decedent. In the initial review, Dr. Kowalski noted that "ethanol or alcohol levels are determined by using whole blood rather than plasma." (App. at 124). Since plasma was used in this case, Dr. Kowalski converted the plasma ethanol level into a blood ethanol level using the most conservative conversion fraction and found that Mr. Loan's blood alcohol level was 146 mg/dL. A blood alcohol level of 146 ml/dL is equivalent to 0.146 percent. He noted that Mr. Loan's blood alcohol content ("BAC") was approximately 1.8 times the typical driving limit in most states, which is 80 mg/dL or 0.08 percent. On appeal, Dr. MacBride concluded that the excess of ethanol in Mr. Loan's system documented in the toxicology report indicated that Mr. Loan's "fall occurred concurrently with the presence of a BAC in excess of the legal limit." (App. at 122).

On January 28, 2008, plaintiffs filed a complaint with the district court, seeking accidental death benefits under ERISA. On December 4, 2008, the district court affirmed Prudential's denial of accidental death benefits to Plaintiffs. On December 19, 2008, Plaintiffs filed a timely notice of appeal.

## DISCUSSION

### I. Standard of Review

"[T]his Court 'review[s] de novo the decision of a district court granting judgment in an ERISA disability benefit action based on an administrative record,' applying the same legal standard as does the district court." *Wenner v. Sun Life Assurance Co. of Can.*, 482 F.3d 878, 881 (6th Cir. 2007) (quoting *Glenn v. MetLife*, 461 F.3d 660, 665-66 (6th Cir. 2006)). If a plan provides a claims administrator with discretionary authority to interpret the terms of the plan or determine eligibility for benefits, a district court will review the administrator's determination under the highly deferential abuse of discretion standard. *See Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2348, 171 L. Ed. 2d 299 (2008) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989)).[1] Where an administrator both evaluates claims for benefits and pays benefits claims, the administrator is operating under a conflict of interest, and the court weighs that conflict as a factor in determining whether the administrator abused its discretion. *Id.*

[1]This Court has interpreted Supreme Court precedent to say that if the plan gives the administrator discretionary authority, this Court must review the administrator's decision under the highly deferential arbitrary and capricious standard. *See, e.g., Smith v. Health Servs. of Coshocton*, 314 F. App'x 848, 854 (6th Cir. 2009). Furthermore, the district court in the instant case applied the arbitrary and capricious standard of review. However, in *Glenn*, the Supreme Court made clear that a court reviewing a decision made by a plan administrator with discretionary authority should apply the highly deferential abuse of discretion standard. *Glenn*, 128 S. Ct. at 2348. Accordingly, we have followed the standard set out by the Supreme Court.

4

Because the plan at issue provides Prudential with discretion, we apply the abuse of discretion standard of review. Furthermore, since Prudential was operating under a conflict of interest, we must weigh that conflict of interest as a factor in determining whether Prudential abused its discretion by denying accidental death benefits to Plaintiffs.

"[A]n abuse of discretion exists only when the court has the definite and firm conviction that the district court made a clear error of judgment in its conclusion upon weighing relevant factors." *Gaeth v. Hartford Life Ins. Co.*, 538 F.3d 524, 528-29 (6th Cir. 2008) (quoting *Moon v. Unum Provident Corp.*, 461 F.3d 639, 643 (6th Cir. 2006)); *see also Stough v. Mayville Cmty. Sch.*, 138 F.3d 612, 614 (6th Cir.1998) ("A district court abuses its discretion when it relies on clearly erroneous findings of fact, when it improperly applies the law, or uses an erroneous legal standard.").

## II.    Prudential's Finding of "Legal Intoxication"

To determine whether Prudential abused its discretion in denying Plaintiffs' claim, we must determine whether it was reasonable for Prudential to find that the decedent's death resulted from his being "legally intoxicated."

### A.  Definition of Legal Intoxication

Neither party disputes that Kentucky law governs the determination of the standard for legal intoxication. However, Plaintiffs argue that the definition for legal intoxication adopted in *Healthwise of Ky., Ltd. v. Anglin,* 956 S.W.2d 213, 217 (Ky. 1997), should govern, while Defendant argues that the definition of legal intoxication under the Kentucky motor vehicle statute should govern. *Compare* Ky. Rev. Stat. Ann. § 222.202(1) ("[a] person is guilty of alcohol intoxication when he appears in a public place manifestly under the influence of alcohol to the degree that he may

5

endanger himself or other persons or property, or unreasonably annoy persons in his vicinity") *with* Ky. Rev. Stat. Ann. § 189A.010(1)(a) ("[a] person shall not operate or be in physical control of a motor vehicle anywhere in this state . . [h]aving an alcohol concentration of 0.08 or more . . .").

In the Kentucky Supreme Court's only pronouncement regarding the definition of legal intoxication, the court held that an intoxication exclusion provision, which was similar in all relevant respects to the exclusion provision at issue, was ambiguous because there were several definitions of legal intoxication that could apply.[2] *Anglin*, 956 S.W.2d at 217. Because ambiguities in insurance contracts should be liberally construed so as to afford coverage, *see Wolford v. Wolford*, 662 S.W.2d 835, 838 (Ky. 1984), the court adopted the definition of legal intoxication under Ky. Rev. Stat. Ann. § 222.202(1), which outlaws appearing in a public place manifestly under the influence of alcohol. *Anglin*, 956 S.W.2d at 217. In *Anglin*, the insured was injured while racing another vehicle at a high rate of speed, and his BAC was found to be 0.21 percent. *Id.* at 215.

The exclusion provision at issue here forbids "being legally intoxicated" and does not indicate which definition of legal intoxication under Kentucky law should apply. Thus, like in *Anglin*, the term is subject to multiple constructions, and, thus, is ambiguous. Furthermore, in addition to the term being ambiguous on its face, adopting the standard under the motor vehicle statute is even less appropriate in this case than in *Anglin* given that Mr. Loan was not operating a motor vehicle at the time of his fall.

---

[2]The intoxication exclusion in *Anglin* read as follows: "Treatment for injuries sustained as a result of being under the influence of alcohol (legal intoxication as defined by Kentucky law) or the illegal use of drugs." *Anglin*, 956 S.W.2d at 216.

Defendant argues that even if the Court were to determine that legal intoxication is an ambiguous term, this Court would be obliged to accept Prudential's interpretation of the terms of the policy because, under an abuse of discretion standard, a court "must accept a plan administrator's rational interpretation of a plan even in the face of an equally rational interpretation offered by the participants." *Morgan v. SKF USA, Inc.*, 385 F.3d 989, 992 (6th Cir. 2004) (internal citation omitted). We agree that under abuse of discretion review the Court is obligated to accept a plan administrator's rational interpretation of a plan. However, we disagree that Prudential's interpretation is rational. Adopting a legal definition specifically intended to apply to someone who is driving a motor vehicle is not rational as applied to someone who is in his own home and is not operating any machinery. Therefore, the Court finds that the definition of legal intoxication that the Kentucky Supreme Court adopted under similar circumstances applies to exclusion provision at issue. Given that the decedent was in his own home, not a public place, he clearly does not meet the test of being legally intoxicated under Kentucky law. *See* Ky. Rev. Stat. Ann. § 222.202(1) ("[a] person is guilty of alcohol intoxication when he appears *in a public place*") (emphasis added). Furthermore, the motor vehicle statute does not outlaw conducting chores around the house while having a BAC above 0.08 percent; it simply outlaws *driving* while having a BAC above 0.08 percent. Thus, even if it were reasonable for Prudential to adopt the definition of intoxication under the motor vehicle statute, Mr. Loan's conduct would not fall under the purview of what the statute prohibits.

Finally, Prudential has not shown that Mr. Loan's accident "result[ed] from" his intoxication, as the plan requires for Prudential to deny coverage. After all, if a claimant is intoxicated while standing on a porch, the porch collapses, and he falls to his death, it cannot be said that his death has

7

resulted from being legally intoxicated. Likewise, where Mr. Loan was not engaging in prohibited conduct, Prudential cannot justifiably assume that Mr. Loan's fall down the stairs and death by blunt force trauma to the head resulted from intoxication.

### B. Prudential's Reliance on Toxicology Report

Prudential's only independent evidence of Mr. Loan's intoxication was the toxicology report produced after he was transported to the hospital. However, Plaintiffs have raised a number of doubts as to the reliability of toxicology reports generally and the reliability of the specific toxicology report generated in this case. Concerning toxicology reports generally, Plaintiffs cite expert treatises detailing the unreliable nature of moving from an estimated BAC value to an assessment of the degree of intoxication during the relevant period. *See, e.g, 1 McCormick on Evidence* § 205 (6th Ed.) (". . . one cannot assume that BAC inevitably is higher at the time of an accident than it is afterwards, at the time of testing, for the concentration rises after drinking, then drops. Extrapolations based on direct measurements of BAC therefore seem more perilous than is generally recognized. . . "). Plaintiffs argue that while the in-house doctors performing the review did not take these issues into consideration, any toxicology expert would have done so. Plaintiffs also point to the variety of factors that may affect BAC over time, including food intake, type and quantity of alcohol, weight, sex, body fat percentage, and rate of absorption. *See* Kupferschmidt, Gerry, *Alcohol Absorption, Distribution & Elimination* (2004), *available at* www.forcon.ca/learning/alcohol.html (last visited Mar. 17, 2010).

Plaintiffs also claim that there were a number of problems with the specific toxicology report at issue. According to Plaintiffs, the blood test was performed on serum, not whole blood as

required under Kentucky law, and test results based on serum can be up to 15% higher. (App. at 82). In addition, Plaintiffs argue that the presence of a variety of matters in Mr. Loan's system, including ketones from an Atkins diet, could have created a false positive report. (App. at 82-83).

However, Dr. MacBride, the in-house doctor who reviewed Plaintiffs' appeal, did not address the majority of these issues; rather, he simply made the conclusory statement that the excess of ethanol in Mr. Loan's system documented in the toxicology report indicated that Mr. Loan's "fall occurred concurrently with the presence of a BAC in excess of the legal limit." (App. at 122). The only reference he made to the claims Plaintiffs' raised on appeal was that the "deceased's spouse . . . speculates that the ethanol elevation was a false positive." (*Id.*) However, he did not refute this possibility except to say that it "lacks credibility" without more information. (*Id.*) In making his recommendations, Dr. MacBride noted that "the above analysis is based on general medical knowledge" and that "[he] do[es] not claim to be a Forensic toxicology specialist." (*Id.*) He indicated that "it may be worthwhile . . . to consider having an external forensic toxicologist review [the record] . . ." (App. at 121).

Defendant argues that Plaintiffs did not provide sufficient proof in their appeal of the initial benefit determination that the toxicology report was flawed. However, Plaintiffs cited a number of general reliability problems with BAC tests conducted as these were and a number of specific factors present in Mr. Loan's case that may have unreliably elevated his BAC. Dr. MacBride did not address any of these in his review.

Without the benefit of a toxicology expert's analysis, it is difficult to determine whether the report in question was reliable. However, inasmuch as Prudential simply ignored the majority of

9

Plaintiffs' attacks on the reliability of the toxicology report and Prudential's own doctor indicated that it might be worthwhile to consult a toxicology expert, it was unreasonable under the circumstances for Prudential to rely on this toxicology report alone, without the benefit of expert analysis, to determine that the decedent was legally intoxicated.

### III.    Prudential's Review of Plaintiffs' Claims

ERISA "underscores the particular importance of accurate claims processing by insisting that administrators provide a full and fair review of claim denials." *Glenn*, 128 S. Ct. at 2350 (internal citations omitted). Specifically, ERISA requires plan administrators to put claimants on notice of the reasons for their denial and to afford claimants an opportunity to appeal the administrator's initial decision. Under ERISA:

> every employee benefit plan shall--
>
> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
>
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133.

In addition, the regulations analyzing ERISA lay out the following procedure for reviewing an appeal of an adverse benefit determination: "[I]n deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment . . . [the plan administrator] shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." 29 § C.F.R. 2560.503-1(h)(iii).

In their appeal of the adverse benefits decision, Plaintiffs raised a number of issues concerning the reliability of the toxicology report, which Prudential's doctor failed to address in his analysis. In Dr. MacBride's report, he made clear that his analysis was based on general medical knowledge, that he was not a toxicology expert, and that it might be worthwhile for Prudential to seek the opinion of a forensic toxicologist. By ignoring this suggestion, Prudential failed to "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." 29 § C.F.R. 2560.503-1(h)(iii).

Prudential argues that it conducted a full and fair review by reviewing the claim a second time and consulting with a second doctor. However, Prudential was on notice that the reliability of the toxicology report was central to the determination on appeal *and* that their reviewing doctor was not in the position to address Plaintiffs' claims. In the interest of reaching an accurate result, as ERISA requires, Prudential should have consulted a toxicologist who could have addressed the issues that Plaintiffs raised on appeal. This is not to say that a plan administrator must always consult a specialist to provide a full and fair review of adverse benefits determinations. However, in a case such as this, where Plaintiffs questioned the accuracy and reliability of the toxicology report in ways that only an expert could adequately address, a toxicology expert was necessary to provide a full and fair review.

Furthermore, Prudential did not seek the opinion of an outside expert who was not operating under Prudential's conflict-of-interest. While the policy terms did not require Prudential to hire an independent expert, this Court must weigh Prudential's conflict as a factor in determining whether the administrator abused its discretion. *Glenn*, 128 S. Ct. at 2348 (internal citations omitted). In the instant case, Prudential's in-house doctor had less incentive than an independent outside doctor to

11

conduct a thorough and accurate review of the record and address the arguments Plaintiffs raised on appeal.

## IV. Disposition

This panel unanimously agrees that Prudential abused its discretion by denying accidental death benefits to Plaintiffs on the basis that the decedent was legally intoxicated without conducting a full and fair review. However, this panel disagrees on the appropriate disposition. Judges Guy and White would vacate the district court's order and remand to permit the parties to be heard and the district judge decide in the first instance whether Plaintiffs are now entitled to a judgment in their favor. Because they constitute a majority, that is the disposition of the Court.

However, this resolution is inappropriate and ill-founded. Judges Guy and White have pointed to no factual disputes that remain in the case. The administrative record is complete, all facts needed to decide the case are readily apparent, and there is no additional evidence to be derived. Because the appropriate outcome–an award of benefits under the policy–is discernible on the basis of this complete record, remanding the case to allow the parties to be heard again is both procedurally inappropriate and an improper waste of judicial resources. *See Shelby County Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 374 (6th Cir. 2009) (finding remand to be an inappropriate remedy when "there are no additional facts to develop or other findings that . . . the plan administrator needs to make"). Accordingly, I would vacate the district court's order and remand with instructions to the district court to order Prudential to award Plaintiffs the appropriate benefits under the policy.

**CONCLUSION**

This panel unanimously agrees that Prudential abused its discretion by denying accidental death benefits to Plaintiffs on the basis that the decedent was legally intoxicated without conducting a full and fair review. As a result, we **VACATE** the district court's order and a majority of this Court **REMANDS** to permit the parties to be heard and the district judge decide in the first instance whether Plaintiffs are now entitled to a judgment in their favor.

**GUY, Jr., concurring in part.** I agree that the summary judgment granted to the defendant should be reversed. However, it is not clear to me that the case is now in a posture that makes it appropriate for us to order the district judge to enter summary judgment for the plaintiff. I would remand and let the parties be heard and the district judge decide in the first instance whether the plaintiff is now entitled to a judgment in her favor.

**HELENE N. WHITE, Circuit Judge, concurring.** Under the policy,[1] the claimants are entitled to benefits for loss due to accidental injury unless the loss resulted from being "legally intoxicated." A review of the administrative record reveals that Prudential found that the exclusion applies based on the single fact that the insured had a plasma alcohol level of 178 mg/dl when his blood was drawn a little over an hour after the fall.

I agree with the majority that Prudential's denial was not the product of a full and fair review. While the in-house medical reviewers did make adjustments for the fact that the hospital's test was performed on plasma, rather than whole blood, the majority correctly observes that the experts did not fully and fairly consider the claimants' other objections to the toxicology report and the inferences drawn therefrom.[2]

The denial was based on the assumptions that the test was not affected by the insured's consumption of cold medicine, or Clonazepam, or the ketones produced by Atkins' diet, and the conclusion, apparently not based on expert analysis, that the blood alcohol level of the blood drawn 1 1/4 hours after the fall accurately reflected the insured's blood alcohol level at the time of the fall. Further, the administrative record reveals no analysis of the timing of the insured's consumption of the alcohol or his size and weight, and no analysis of the likely effects of a particular blood alcohol level on particular activities. Instead, the medical evaluations were based on general statements and

---

[1]Prudential relies on the exclusion to deny coverage, and does not appear to argue that the loss does not otherwise satisfy the conditions for coverage.

[2]I do not read Dr. MacBride's statement that "it may be worthwhile, if warranted, to consider having an external forensic toxicology specialist review to bolster what Dr. Kowalski and I have already concluded" as the doctor's admission that he lacked sufficient expertise. Rather, the comment was made to the claims department in the context of an observation that the claimant wife works for a national firm that does diagnostic labwork. In any event, this comment is not crucial to the evaluation of the claimants' case.

15

conclusions amounting to an assumption that because the fall occurred when the insured had a particular blood alcohol level (based on the later test), the fall must have resulted from intoxication. Additionally, the administrative record reveals that no consideration was given to the insured's wife's account of the insured's behavior prior to the fall, and no attempt was made to see whether such claims could be verified. While the insured's wife is certainly an interested party as a claimant, it does not follow that her account can properly be dismissed without any consideration or investigation.

Thus, I agree that Prudential abused its discretion and acted arbitrarily and capriciously in denying this claim. I would remand, for the reasons stated in Judge Guy's concurrence.